451 So.2d 627 (1984)
Michael H. ALAYNICK, M.D. and Robert L. Mimeles, M.D.
v.
JEFFERSON BANK & TRUST COMPANY.
No. 83-CA-791.
Court of Appeal of Louisiana, Fifth Circuit.
May 14, 1984.
*628 Douglas A. Kewley, Bruce A. North, Metairie, for defendant-appellant.
Lee R. Miller, Jr., Floyd Hennen, New Orleans, for plaintiffs-appellees.
Before BOUTALL, CHEHARDY and DUFRESNE, JJ.
DUFRESNE, Judge.
This is an appeal by Jefferson Bank and Trust Co., defendant-appellant, from an adverse judgment in the amount of $20,000, for converting to its own use a collateral mortgage note pledged by Bruce Coffman to Drs. Michael Alaynick and Robert Mimeles, plaintiffs-appellees, to secure a debt owed to them. Because we find that the bank breached its fiduciary duty owed to plaintiffs as their mandatary in using the note as its own security, we affirm.
The facts are these. In early 1979, Bruce Coffman was put in touch with Drs. Alaynick and Mimeles by a mutual friend in regard to a real estate speculation. After negotiations, the three men entered into an agreement on February 28, 1979, whereby in return for a loan of $75,000, Coffman agreed to repay $95,000. The additional $20,000, was referred to in the agreement as a "fee". The agreement further provided that a collateral mortgage for $145,000 on the property to be purchased would be recorded, a collateral mortgage note of $95,000, would be delivered to the doctors, and a second collateral mortgage note of *629 $50,000, would be held by Coffman. The bank was not a party to this agreement.
On the same date, these parties appeared at Jefferson Bank where Alaynick, Mimeles and Coffman all regularly did business, and signed respectively, and at different hours, the following documents, all dated February 28, 1979.
1. An unsecured promissory note for $37,000, for a loan to Mimeles, and signed only by him.
2. A promissory note for $37,500, for a loan to Alaynick, signed by him, and secured only by the personal endorsement of Coffman.
3. A promissory note for $50,000, for a loan to Coffman, and signed by him, but otherwise showing no security.
4. Two collateral mortgage notes payable to bearer in the amounts of $95,000 and $50,000, both signed by Coffman, and paraphed "ne varietur" with a collateral mortgage of $145,000, properly recorded on February 28, 1979.
The proceeds of the three loans apparently were used by Coffman to purchase the property. The $95,000 collateral mortgage note was pledged to the doctors, with Alaynick receiving actual possession. There is no evidence to show whether the $50,000 collateral mortgage note was given to the bank at that time or retained by Coffman. However, the $50,000 promissory note does not show any security as of February 28, 1979, and Donald Weekly, the bank officer who approved the loan, testified that to the best of his knowledge, the loan was unsecured when made.
Weekly left the employ of the bank about a month after this transaction, and the file was turned over to Richard Lee, another bank officer. Sometime in May, 1979, Lee noted that in his opinion the bank did not have adequate security on the three promissory notes. He contacted Alaynick and learned that the doctor held a $95,000 collateral mortgage note. He thereupon asked Alaynick to meet him at the bank, and at that meeting Alaynick surrendered the note to Lee and was given a receipt.
On May 21, 1979, several lots from the mortgaged property were sold. With the approval of the doctors, the entire proceeds of this sale were applied by the bank to pay in full the $37,500, Alaynick note, and to reduce the $37,500, Mimeles note to some $16,000.
On July 18, 1979, the bank had Coffman sign a "collateral pledge agreement" wherein he ostensibly pledged to the bank the original collateral mortgage notes of $95,000 and $50,000. Also, on July 18, 1979, the bank noted on Coffman's $50,000, promissory note that it was now secured by the collateral mortgage notes pledged to the bank that same day.
In February, 1980, the remainder of the mortgaged property was sold, and the net proceeds of some $75,000, were paid to the bank as holder of the two collateral mortgage notes. These funds were applied by the bank to satisfy the $50,000 Coffman note, the outstanding $16,000 on the Mimeles note, some $5,000 to satisfy an additional loan to Coffman to pay a sewerage district lien on the property, and interest on these various items.
The $20,000 "fee" owed by Coffman to the doctors was not paid, and after unsuccessful efforts to obtain this fee from the bank, Alaynick and Mimeles brought the present action.
After trial, the court rendered judgment in favor of Alaynick and Mimeles, and against the bank, in the amount of $20,000. The court found that the "bank was aware of the plaintiffs' preferential creditor status to the proceeds and converted the plaintiffs' security to its own use and benefit." The defendant bank now appeals.
Three errors are alleged on the part of the trial court:
1. It was error to find that plaintiffs occupied a preferential creditor status.
2. It was error to find that the bank converted plaintiffs' security to its own use.

*630 3. Because the bank was not a party to the agreement between Coffman and plaintiffs, it was error to hold the bank liable for the $20,000 fee.
These allegations are without merit.
Regarding the bank's first alleged error, the following legal principles are applicable.
A collateral mortgage consists of three parts: 1.) a promissory note, usually called the collateral mortgage note or "ne varietur" note, 2.) which is secured by a collateral mortgage, and 3.) which note and underlying mortgage are pledged to the creditor as security for an independent and distinct indebtedness, First Guaranty Bank v. Alford, 366 So.2d 1299 (La.1978). Moreover, because the pledge of the collateral mortgage note is contractual, the pledge secured only that indebtedness contemplated in the contract of pledge between the pledgor and the pledgeeCivil Code Art. 3133; Durham v. First Guaranty Bank of Hammond, 331 So.2d 563 (La. App. 1st Cir.1976). Finally, when properly recorded, the pledgee's ranking among other creditors of the pledgor is established on the date that the collateral mortgage note is pledged, or as more commonly expressed, "issued".
Applying these principles to the present facts, it is clear that as of February 28, 1979, the doctors held a valid collateral mortgage note to secure an indebtedness of $95,000. There was a recorded collateral mortgage on the property at issue, and the collateral mortgage note was properly paraphed to that mortgage. The agreement between the doctors and Coffman evidences an indebtedness of $95,000 and specifies that this indebtedness is secured by the pledge of the $95,000 collateral mortgage note.
The bank argues, to the contrary, that there was no connexity between the indebtedness and the collateral mortgage note so as to establish a pledge of the note to secure that indebtedness. We need only quote the following language from the agreement evidencing an indebtedness of $95,000, to show otherwise:
O. Bruce Coffman ... shall render unto Michael H. Alaynick and Robert L. Mimeles... a first collateral mortgage in the amount of $145,000.00 and a collateral mortgage note in the amount of $95,000.00.
This allegation by the bank is therefore groundless.
The bank further asserts in brief that the $50,000 collateral mortgage note was pledged to it by Coffman on February 28, 1979, to secure the $50,000 promissory note. The apparent thrust of this claim is that the bank's ranking is thus contemporaneous with that of the doctors, and therefore it should at least share in the proceeds of the sale on a pro-rata basis. This purported delivery of the note is not, however, shown by the evidence. Neither Weekly nor Lee made any reference to possessing the $50,000 collateral mortgage note as of February 28, 1979. Indeed, Weekly testified to the contrary that "as far as I know, my February 28, 1979 $50,000 loan to Coffman was unsecured." The only other evidence as to this note is that it was pledged to the bank on July 18, 1979, by way of the collateral pledge agreement of that date. Moreover, the back of the $50,000 promissory note shows that the only security on that indebtedness is the collateral pledged by the collateral pledge agreement of July 18th. On these facts, we can only conclude that the $50,000 collateral mortgage note was actually pledged or issued to the bank on July 18, 1979, and therefore that it is of inferior rank to the pledge of the $95,000 note of February 28, 1979, to the doctors.
The next issue is whether the bank improperly converted the doctors' security device to its own benefit, or more properly in the analysis adopted below, whether the bank breached a fiduciary duty owed the doctors. Under La.Civ.Code Art. 2985, a mandate arises when a person grants power to another to transact for him and in his name one or several affairs. The mandate may be conferred orally, and is perfected on acceptance by the mandatary, La.Civ. *631 Code Arts. 2792, 2988. In addition, the acceptance may be tacitly made when the mandatary acts under it, La.Civ.Code Art. 2989.
In the case before us, Alaynick testified that when he surrendered the $95,000 note to the bank he understood that the only purpose of this surrender was to have certain properties released from the collateral mortgage. It was his further understanding that the funds resulting from that sale would accrue solely to him and Mimeles, and that he authorized the bank to credit these funds toward his and Mimeles' promissory notes held by the bank. He finally stated that he assumed that the bank would likewise collect for him and Mimeles the remaining sums secured by the note when the rest of the property was sold. In our opinion, this was the only business which Alaynick authorized the bank to conduct for him. Further, the bank tacitly accepted this mandate by removing the properties from the mortgage and crediting all funds from the sale to the promissory notes.
Lee admitted that Alaynick's testimony was substantially correct, but asserted that, he informed Alaynick that the bank also needed the note for security, and that Alaynick agreed to this. The bank produced no other evidence to corroborate Lee's version of the transaction. It is apparent, therefore, that the trial court believed Alaynick, and not Lee, and where the credibility of two contradictory witnesses is at issue, this court will not disturb finding of fact based thereon, absent some manifest error, Canter v. Koehring Co., 283 So.2d 716 (La.1973). As we perceive no such error here, we find that the bank accepted a mandate to collect the indebtedness to the doctors which was secured by the collateral mortgage note of $95,000.
The next question which must be answered is whether the bank breached its duty to perform the mandate properly. The rule in our jurisprudence is that an agent or mandatary must conduct the affairs of his principal as though they were his own, and must not take even the slightest advantage of his principal, Noe v. Roussel, 310 So.2d 806 (La.1975). On the present facts, there can be no question that the bank breached this duty. As we have already shown, the doctors held a preferred collateral mortgage note to secure an indebtedness. At the final sale of the property, had they still been in possession of the note, they would have been paid in preference to the bank, all sums still owed them on Coffman's indebtedness. Under the mandate, the bank clearly had the obligation to see that the funds were so collected and applied. Yet not only did it fail to so distribute the funds, but even went so far as to have Coffman sign an agreement purporting to transfer the security interest represented by the $95,000 note to the bank itself. This constituted an obvious breach of the bank's duty, and renders the bank liable to its principles for the $20,000, which they would have received had this breach not occurred.
The bank argues, to the contrary, that the promissory notes signed by the doctors created a security interest in their property, and therefore when it received the $95,000 note, this was in effect an authorized pledge of that note. While we have serious reservations as to whether a collateral mortgage note can be effectively pledged to a third party by the pledgee without at the same time delivering the instrument of indebtedness which that note secures, we need not resolve that issue here. Cf. La. Civ.Code Art. 3142 Odom v. Cherokee Homes, Inc., 165 So.2d 855 (La.App. 4th Cir.1964). We need only state that even were the pledge of the $95,000 note proper, the bank could only have acquired a $75,000 interest in that security device because that was the extent of the indebtedness owed to it by the doctors. What the bank attempted, in effect, was to use the remaining security of $20,000 as collateral for the Coffman $50,000 promissory note. Yet nowhere in the record is there even a hint, much less proof, that the doctors obligated themselves to the bank as securities for the Coffman loan. This simply cannot be done, La.Civ.Code, Arts. 3035, 3039.
*632 The final error urged by the bank is that because it was not a party to the Coffman-Alaynick-Mimeles agreement, it cannot be liable for payment of the fee. This assertion is irrelevant. To adopt this reasoning would lead to the result that any creditor of inferior rank could attack a superior creditor's preferred claim to funds on the grounds that he was not a party to the agreement, giving rise to the indebtedness between that preferred creditor and the debtor. This would simply be absurd.
Because we find that Alaynick and Mimeles were preferred creditors, that Jefferson Bank was their mandatary, and that it breached its fiduciary duty under the mandate, we hold that it is liable to plaintiffs for the $20,000 loss occasioned by this breach. The judgment of the trial court is therefore affirmed. Costs to be paid by defendant-appellant.
AFFIRMED.